# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 8, 2023

Lyle W. Cayce
Clerk

No. 21-40333

---

Springboards to Education, Incorporated,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

McAllen Independent School District,

*Defendant—Appellee/Cross-Appellant*,

---

No. 21-40334

---

Springboards to Education, Incorporated,

*Plaintiff—Appellant*,

*versus*

IDEA Public Schools,

*Defendant—Appellee.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:16-CV-523
USDC No. 7:16-CV-617

---

Before Smith, Duncan, and Oldham, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

Springboards for Education ("Springboards") brought trademark infringement claims against McAllen Independent School District ("MISD"), a public school district in Texas, and IDEA Public Schools ("IDEA"), a nonprofit organization operating charter schools in Texas. The district court dismissed the suit against IDEA, concluding it was an arm of the state and therefore shared Texas's sovereign immunity. As for MISD, the court found that it did not have sovereign immunity but ultimately granted summary judgment in MISD's favor. Agreeing that MISD does not have sovereign immunity and that it was entitled to summary judgment on the merits, we affirm the district court's judgment for MISD. Although we disagree with the district court's conclusion that IDEA has sovereign immunity, we affirm the judgment for IDEA on alternate grounds.

I.

Springboards is a Texas corporation that sells educational materials designed to encourage schoolchildren to read. At issue in this case is Springboards' Read a Million Words Campaign ("Campaign"), which urges students to read one million words over the course of the schoolyear. Participating schools receive a customized kit with Springboards' educational materials, and students who successfully meet their reading goals become Millionaire Readers and are inducted, with much fanfare, into the Millionaire's Reading Club. Springboards has registered several trademarks in connection with the Campaign, including "Read a Million Words," "Million Dollar Reader," and "Millionaire Reader."

Springboards has been vigilant in combatting what it perceives as infringement of its trademarks by local schools that operate their own monetary-themed reading programs. Our court has affirmed dismissals of

Nos. 21-40333 and 21-40334

Springboards' trademark claims against two Texas school districts.[1] This appeal concerns similar claims against MISD and IDEA[2] under the Lanham Act, 15 U.S.C. §§ 1051 *et. seq.*, alleging trademark infringement, trademark counterfeiting, and false designation of origins.[3] MISD is a public school district in Hidalgo County, Texas, and IDEA is a nonprofit corporation that runs public charter schools throughout Texas.

Springboards alleges that MISD infringed Springboards' trademarks through its reading program. Many MISD schools track the number of words students read each year and present students who read a million words with faux million-dollar bills bearing the phrase "Million Dollar Reader." Various MISD schools have posts on their websites or social media celebrating their "Millionaire Reader[s], "Millionaires," and referring to a "millionaire club."

Springboards alleges similar infringement by IDEA through its reading program. IDEA schools present awards to students who achieve "IDEA Millionaire Reader status" and host "IDEA Millionaire Reader's Celebration[s]" in recognition of their accomplishment. IDEA schools sometimes share information about these events and the millionaire reading program online.

In the district court, both MISD and IDEA moved to dismiss for lack of subject matter jurisdiction, arguing they were arms of the state and thus

---

[1] *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805 (5th Cir. 2019), as revised (Feb. 14, 2019) (affirming dismissal of Lanham Act claims against a public school district); *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747 (5th Cir. 2022) (same).

[2] We address the two suits together, as did the district court.

[3] Springboards also brought claims against MISD and IDEA for trademark dilution under the Lanham Act, the dismissals of which it does not appeal.

entitled to sovereign immunity. Both also moved for summary judgment. The district court disposed of these motions at the same time. It ruled that only IDEA enjoyed sovereign immunity and, accordingly, granted IDEA's motion to dismiss and denied MISD's. However, the court granted MISD summary judgment, concluding Springboards could not establish MISD's program was likely to cause confusion with respect to Springboards' trademarks.

Springboards now appeals the summary judgment in favor of MISD, while MISD cross-appeals its denial of sovereign immunity. Springboards also appeals the dismissal of its claims against IDEA on the basis of sovereign immunity.

## II.

We review both the district court's determination of sovereign immunity and its summary judgment *de novo. Richardson v. Flores*, 28 F.4th 649, 653 (5th Cir. 2022); *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 504 (5th Cir. 2018). We may affirm a judgment on grounds other than those relied upon by the district court if the record contains an adequate and independent basis for that result. *Lauren C. by & through Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 374 (5th Cir. 2018); *Chauvin v. Tandy Corp.*, 984 F.2d 695, 697 (5th Cir. 1993).

## III.

We begin with the threshold jurisdictional issue of whether IDEA and MISD enjoy sovereign immunity. *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002) ("Federal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies."). The Eleventh Amendment recognizes the background constitutional principle that states, as separate sovereigns, are inherently immune from suit without their consent. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39–40 (1994); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44,

54 (1996); *see also* The Federalist No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("It is inherent in the nature of [a State's] sovereignty not to be amenable to the suit of an individual *without its consent*."). That immunity extends to so-called arms of the state, entities which are effectively the state itself because "the state is the real, substantial party in interest" to the lawsuit. *Hudson v. City of New Orleans*, 174 F.3d 677, 681 (5th Cir. 1999) (quoting *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 344 (5th Cir. 1998)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

In determining whether an entity is an arm of the state, we balance the so-called "*Clark* factors," which our court first articulated decades ago in *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986). Those factors are: (1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether it has the right to hold and use property. *Clark*, 798 F.2d at 744–45. The second factor carries the most weight, while factors five and six are of lesser importance. *Hudson*, 174 F.3d at 682; *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 596 (5th Cir. 2006). But "no single factor" is dispositive; courts consider the factors "as a whole." *Clark*, 798 F.2d at 745. The burden of proof rests with the entity asserting immunity. *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000).

The *Clark* factors have not escaped criticism. Recently, they were fairly described as "hav[ing] all the precision of a blunderbuss." *Cutrer v. Tarrant Cnty. Loc. Workforce Dev. Bd.*, 943 F.3d 265, 270 (5th Cir. 2019), as revised (Nov. 25, 2019). "No factor or combination of [the factors] is necessary. None is sufficient. And *Clark* says nothing about how to 'balance' them." *Ibid.* That imprecision is on display here. Making a good faith attempt

Nos. 21-40333 and 21-40334

to apply the factors, the district court concluded a public school district was *not* an arm of the state, but a public charter school *was*. That is puzzling, to put it mildly. *See, e.g.*, *Black*, 461 F.3d at 596 ("Generally, school boards and districts are not arms of the state shielded by Eleventh Amendment immunity."). As discussed below, our application of the factors differs meaningfully from the district court's, particularly as to IDEA.

A.

We begin with IDEA. Examining each *Clark* factor, we conclude that, contrary to the district court's ruling, IDEA is not an arm of the state.

1.

For the first *Clark* factor, we examine how the state perceives the entity through its constitution, laws, and other official pronouncements. *Hudson*, 174 F.3d at 683. IDEA points out that Texas considers public charter schools as arms of the state and directs us to the Texas Supreme Court's decision in *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521 (Tex. 2020). That case held that because "open-enrollment charter schools act as an arm of the State government," they receive state sovereign immunity. *Id.* at 529–30. *See also HWY 3 MHP, LLC v. Elec. Reliability Council of Texas*, 462 S.W.3d 204, 210 (Tex. App. 2015) (noting that "open-enrollment charter schools should be treated as governmental units"). While the Texas courts' decisions on state sovereign immunity are not dispositive as to federal sovereign immunity, we agree with IDEA that this factor weighs in favor of immunity. Texas law "reflects the state's view that suing [IDEA] is equivalent to suing the state of Texas itself." *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 328 (5th Cir. 2002).

2.

Factor two, the funding inquiry, is more complex and ends up cutting against immunity. The inquiry has two parts. "[F]irst and most importantly," we examine "the state's liability in the event there is a judgment against the defendant, and second, [we consider] the state['s] liability for the defendant's general debts and obligations." *Vogt*, 294 F.3d at 693 (quoting *Hudson*, 174 F.3d at 687). Whether the state would be liable for a judgment depends primarily on whether it indemnifies the defendant, the degree that it funds the defendant, and the extent that it restricts the defendant's use of state-provided funds. *See Perez*, 307 F.3d at 328; *Hudson*, 174 F.3d at 686–88. Factor two carries the most weight because one of the Eleventh Amendment's central purposes is to protect state treasuries from involuntary liability. *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 440–41 (5th Cir. 1985); *see also Hess*, 513 U.S. at 48 (noting with approval that most circuits privilege this factor).

The district court found, and IDEA continues to argue, that the first part of the funding inquiry favors immunity because "94 percent of [IDEA's] funding comes from State and federal sources." We disagree. For several reasons, a hypothetical judgment against IDEA would likely not be paid with state funds. To begin with, IDEA's argument improperly aggregates state and federal funds. *See Cutrer*, 943 F.3d at 271 (denying immunity where an entity claimed to depend on public funds but failed to demonstrate its reliance on "*state* funds") (emphasis in original). The Eleventh Amendment is concerned only about the potential impact on the state treasury. *See Pendergrass*, 144 F.3d at 345 (explaining that the relevant rationale is "the protection of state treasuries"). Whether federal money is at stake is irrelevant.

Disaggregating the sources of IDEA's funding shows that any risk of a judgment's being paid from state funds is remote. IDEA draws its 94% figure from IDEA's 2016–2018 financial reports. Those show that roughly a quarter of IDEA's annual funding comes from local and federal sources. Those amounts run into the tens of millions. In 2018 alone, IDEA took in about $27 million from local sources and $71 million from the federal government, including almost $17 million given directly to IDEA without any state processing. This cuts sharply against IDEA's immunity, because the funding inquiry "concerns whether the state is 'directly responsible for a judgment' or 'indemnifies the defendant.'" *Stratta v. Roe*, 961 F.3d 340, 354 (5th Cir. 2020) (quoting *U.S. ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 440 (5th Cir. 2004) (cleaned up)). IDEA's ample funding from local and federal sources belies the assertion that Texas would be "directly responsible for a judgment."[4] And IDEA points to no evidence that Texas is obligated to indemnify it. *See Vogt*, 294 F.3d at 693 (weighing against immunity the fact that "the state has no duty to pay a judgment" against the entity).

Moreover, IDEA concedes that the "overwhelming majority" of its state funding is "earmarked"—meaning it comes with state-imposed restrictions on how the funds may be spent. Those restrictions also cut against immunity. Whether "funding is earmarked for any particular purpose" is relevant "to determine whether a judgment likely would be paid with state funds." *Perez*, 307 F.3d at 328. When state funds are set aside for specific uses, that weighs against immunity because those funds are necessarily unavailable to satisfy legal liabilities. *Hudson*, 174 F.3d at 688

---

[4] To be clear, as in past cases, "we do not draw a bright-line rule as to the amount of [non-state] funding necessary to hold an entity financially independent from the state." *Daniel v. Univ. of Texas Sw. Med. Ctr.*, 960 F.3d 253, 258 (5th Cir. 2020).

("Importantly, either all or substantially all of the funds from the State are earmarked for specific purposes . . . . These funds cannot be used to pay a . . . judgment."); *Vogt*, 294 F.3d at 694 ("Because the state funds are already earmarked for other purposes, the state monies cannot be used to pay a judgment against [the entity]."); *Pendergrass*, 144 F.3d at 345–46. IDEA cannot concede that the bulk of its state funds is restricted while at the same time arguing it would have to use those same funds to pay a judgment.[5]

We turn to the second (and less important) part of factor two: whether Texas may be indirectly liable because it is "responsible for the defendant's general debts and obligations." *Hudson*, 174 F.3d at 688. Unlike its traditional public school counterparts, IDEA cannot generate its own revenue by levying taxes. Tex. Educ. Code § 12.102(4). It must instead issue bonds, which Texas guarantees. *Id.* § 45.05219; 19 Tex. Admin. Code §33.67. IDEA's inability to independently raise revenue counsels in favor of immunity. *Perez*, 307 F.3d at 329. And the fact that Texas guarantees its bonds is also relevant. *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 320 (5th Cir. 2001). However, these indirect indicators do not ultimately move the needle. We have suggested that "where the state's only liability was in guaranteeing a state authority's notes and bonds," this "'ancillary effect' on the state treasury does not confer immunity under the Eleventh Amendment." *Jacintoport*, 762 F.2d at 441 (citing *Blake v. Kline*, 612 F.2d 718, 726 (3d Cir. 1979)). Here, in light of the reasons discussed above, "[a]ny influence upon the state treasury by . . . a judgment would be too indirect and remote to

---

[5] Nor can IDEA argue that a judgment against it might lead Texas to provide additional unrestricted funds to satisfy the liability. We have rejected the argument that the "remote possibility that the state will elect to pay a judgment" constitutes a threat to the state treasury. *Hudson*, 174 F.3d at 689. Nor does IDEA provide any evidence that Texas regularly provides money to satisfy liabilities, despite having no obligation to do so. *Cf. Vogt*, 294 F.3d at 693.

Nos. 21-40333 and 21-40334

characterize it as a potential liability of the state treasury or to make the state the real, substantial party in interest." *Pendergrass*, 144 F.3d at 346. So, to sum up, factor two weighs against immunity because Texas is unlikely to have to pay for an adverse judgment and its indirect responsibility is limited to its "ancillary" backing of IDEA's bonds.

3.

Factor three considers whether the entity is autonomous or controlled by the state. We look to the degree of independence enjoyed by the entity and its managers, as well as how its managers are appointed. *Vogt*, 294 F.3d at 694; *Stratta*, 961 F.3d at 354. "Frequent and broad oversight by the state suggests that the entity is an arm of the state." *Perez*, 307 F.3d at 330. Texas pervasively regulates charter entities like IDEA. Texas courts have recognized that a charter school's charter is "entirely contingent on State discretion." *Texas Educ. Agency v. Am. YouthWorks, Inc.*, 496 S.W.3d 244, 262 (Tex. App. 2016). Texas may unilaterally withhold funding or suspend the charter school's authority to operate if the school violates its charter or state law. Tex. Educ. Code § 12.1162(b). Texas may even "reconstitute" the governing body of a charter school and appoint new members to the governing body. *Id.* § 12.115(a), (d). And charter schools must satisfy Texas's annual performance evaluations by meeting state-mandated benchmarks. *Id.* § 12.1181. Provisions like these show that Texas has broad oversight and control over IDEA, which counsels in favor of immunity.

4.

The fourth factor turns on "whether the entity acts for the benefit and welfare of the state as a whole or for the special advantage of local inhabitants." *Pendergrass*, 144 F.3d at 347. The district court found that IDEA "operates campuses statewide and with a statewide purpose of providing public education," and IDEA continues to press that argument

here, contending "education is a statewide concern." But IDEA sets the inquiry at too high a level of generality. We have already rejected this argument in the context of a levee board's arguing that it combatted the "statewide problem" of flooding. *Vogt*, 294 F.3d at 695. The relevant inquiry, we explained, "focuses on the tasks undertaken by the particular defendant." *Ibid.* By contrast, we noted that "primary education and law enforcement are also statewide concerns, yet school boards and sheriffs are not arms of the state." *Ibid.* So too here. Education may be a statewide concern in the abstract, but IDEA's day-to-day "tasks" consist in operating local schools. Just as the levee board in *Vogt* contributed to a statewide undertaking but was local in nature because its primary concern was the local levees, IDEA too is a local entity acting "for the special advantage of local inhabitants." *Pendergrass*, 144 F.3d at 347.

Nor can IDEA turn this factor to its advantage by pointing to the sheer number of schools it operates throughout Texas. To the contrary, our precedent teaches that an entity's limited scope of jurisdiction counsels against immunity. *See Vogt*, 294 F.3d at 695 ("[M]ost entities that are entitled to Eleventh Amendment immunity have statewide jurisdiction."). While IDEA may operate schools throughout Texas, that does not somehow give IDEA statewide jurisdiction. Rather, IDEA's schools each serve geographically limited communities. Properly understood, IDEA's "jurisdiction" is limited to particular areas where it has a school. Accordingly, factor four weighs against immunity.

5.

Factor five, which carries little weight, considers whether the entity can sue and be sued in its own name. That ability points against immunity. *Perez*, 307 F.3d. at 331. IDEA concedes it has previously sued and been sued under its own name. But it argues that this factor still favors immunity

because Texas specifically allows independent school districts to sue and be sued, while remaining silent as to charter schools. *See* Tex. Educ. Code §11.151(a) (allowing independent school districts to "sue and be sued" in the name of the district). IDEA points to our decision in *Perez*, which concluded that where state law is silent as to the entity's power to sue but expressly allows analogous entities to do so, this factor "slightly favors" immunity. *Perez*, 307 F.3d. at 331. *Perez* is distinguishable, however. *Perez* made no finding about whether the entity in question had a history of suing in its own name—it based its conclusion merely on the silence in state law. Not so here. IDEA concedes it has a history of suing in its own name. This factor thus weighs against immunity.

6.

Finally, factor six asks whether the entity can hold and use property. If it can, that points away from immunity. Texas law is clear on this point: "[W]hile an open-enrollment charter school is in operation, the charter holder holds title to any property . . . and may exercise complete control over the property as permitted under the law." Tex. Educ. Code § 12.128(b). As IDEA observes, though, Texas law also states that property purchased by a charter holder with state funding "is considered to be public property for all purposes under state law" and is "property of this state held in trust by the charter holder for the benefit of the students." *Id.* § 12.128(a). If a charter school ceases operations, Texas takes possession and control of the property. *Id.* § 12.128(c). IDEA argues that these restrictions show that it does not truly hold property.

We disagree. Our precedent rejects the argument that this factor points toward immunity where the entity held title but "all of [the entity's] property ultimately belong[ed] to the state." *Vogt*, 294 F.3d at 696. Because Texas law provides that the charter holder holds title to its property, this

factor also weighs against immunity. *See also Pendergrass*, 144 F.3d at 347 (weighing this factor against immunity despite the fact that "at some time in the distant future" the entity's property "may revert to the state").

\* \* \*

In sum, factors one and three favor sovereign immunity while factors two, four, five, and six do not. Balancing all the factors, and giving greater weight to factor two, we conclude that IDEA is not an arm of the state and does not share in Texas's sovereign immunity.

## B.

Because MISD cross-appeals the district court's ruling that it is not entitled to sovereign immunity, we must also apply the *Clark* factors to it. Guided by our foregoing analysis, we easily conclude the district court was correct. *See Lopez v. Houston Indep. Sch. Dist.*, 817 F.2d 351, 353 (5th Cir. 1987) (finding a Texas independent school district was "sufficiently distinct from the state to be outside the [E]leventh [A]mendment"), *overruled on other grounds*, *Walton v. Alexander*, 44 F.3d 1297, 1303 n.4 (5th Cir. 1995) (en banc); *San Antonio Indep. Sch. Dist. v. McKinney*, 936 S.W.2d 279, 284 (Tex. 1996) (holding that "an independent school district is more like a city or county than it is like an arm of the State of Texas and is amenable to suit in federal court under the Eleventh Amendment"); *Black*, 461 F.3d at 596 ("Generally, school boards and districts are not arms of the state shielded by Eleventh Amendment immunity.").

As with IDEA, factor one weighs in favor of immunity. Texas courts have long recognized that independent school districts are part of the state itself and therefore enjoy state sovereign immunity. As far back as 1931, the Texas Supreme Court referred to them as "state agencies, erected and employed for the purpose of administering the state's system of public schools." *Love v. City of Dallas*, 40 S.W.2d 20, 26 (Tex. 1931). More recently,

the supreme court stated it is "well settled in this state that an independent school district is an agency of the state" and thus enjoy immunity unless Texas waives it. *Barr v. Bernhard*, 562 S.W.2d 844, 846 (Tex. 1978).

The second and weightier factor cuts against immunity because a judgment against MISD would not fall upon Texas. In response, MISD contends that recent changes to state law make school districts somewhat more reliant on state funding. This argument fails for at least two reasons. First, MISD still receives significant funding from non-state sources. The record shows that roughly half of MISD's annual revenue comes from sources other than the state. In 2019, for instance, MISD collected about $90 million from local and intermediate sources, $20 million from federal sources, and $6 million from "Other Resources." There is little reason to think the state treasury would be implicated by a judgment against MISD. Second, while Texas law does impose some limits on school districts' taxing power,[6] they still maintain the power to levy certain taxes and to issue bonds. *See* Tex. Educ. Code §§ 45.001, 45.002. The ability to self-finance weighs heavily against immunity. *See Pendergrass*, 144 F.3d at 346.

Factor three, the degree of local autonomy, weighs in favor of immunity because Texas exerts considerable oversight and control over its school districts. School districts are subject to state accreditation, as well as academic performance and financial accountability standards, and Texas can take corrective action for any failure to comply. *See* Tex. Educ. Code § 39A.001. Indeed, Texas can close a noncompliant district and annex it to an adjoining district. *Id.* § 39A.005. Texas also has significant influence over

---

[6] *See, e.g.*, Tex. Educ. Code § 45.0021 (preventing districts from levying maintenance taxes to create a surplus to pay the district's debt); *id.* § 45.0032 (placing limits on maintenance, operations, and enrichment taxes); *id* § 45.003 (requiring some taxes to be authorized by a majority of the district's voters).

the day-to-day operations of school districts, as it controls to varying degrees matters like school curriculum and student transportation. *See, e.g.*, *id.* § 28.002 (required curriculum); *Id.* § 34.002, 34.003 (statewide bus safety standards).

As with IDEA, factor four points away from immunity because school districts meet local rather than statewide needs. MISD serves students in Hidalgo County, not Texans generally. It thus operates "for the special advantage of local inhabitants." *Pendergrass*, 144 F.3d at 347. This limited jurisdiction counsels against immunity. *Vogt*, 294 F.3d at 695.

Factors five and six likewise weigh against immunity. Texas law provides that the trustees of an independent school district "in the name of the district may acquire and hold real and personal property [and] sue and be sued." Tᴇx. Eᴅᴜᴄ. Cᴏᴅᴇ § 11.151(a). While of lesser importance, this authority shows the district is separate from the state.

Altogether, only factors one and three weigh in favor of immunity and the marquee second factor points the other way. We therefore agree with the district court that MISD is not an arm of the state and is not entitled to sovereign immunity

IV.

We turn to Springboards' trademark claims and conclude that the district court properly granted summary judgment in MISD's favor. We also conclude that judgment for IDEA is proper, "exercis[ing] our discretion to affirm on unadvocated grounds supported by the record." *United States v. Sanchez*, 900 F.3d 678, 687 n.8 (5th Cir. 2018).

The Lanham Act imposes liability on anyone who, without consent, uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale,

Nos. 21-40333 and 21-40334

distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion . . . ." 15 U.S.C. § 1114(1)(a). The likelihood of confusion is our focus here, as it is a prerequisite to recovery for all of Springboards' claims. *See Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 750–51. (5th Cir. 2022). For Springboards to prevail, it must show that MISD's use of Springboards' marks "create[d] a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship" of MISD's products or services. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998). "Likelihood of confusion means more than a mere possibility; the plaintiff must demonstrate a probability of confusion." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (internal citation omitted).

To assess whether confusion is likely, we consider a flexible list of factors called the digits of confusion. These include:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion . . . [and] (8) the degree of care exercised by potential purchasers.

*Bd. of Supervisors for LSU v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (cleaned up) (citation omitted). No one factor is dispositive, and we may consider any other relevant factor. *Capece*, 141 F.3d at 194.

However, there is a threshold issue before we can reach the likelihood of confusion. First, "we must identify the class of consumers at risk of confusion." *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019), as revised (Feb. 14, 2019). That is a problem here

because Springboards is neither clear nor consistent about whom it considers to be at risk of confusion.

Springboards represents that its business model involves selling its Campaign to schools as units, tailoring the contents and theme to each school. *Houston Indep. Sch. Dist.*, 912 F.3d at 813 ("Springboards' business model is premised on marketing the Read a Million Words campaign to school districts and selling those districts the products and services needed to implement the campaign."). Springboards does not allege that MISD marketed its own millionaire club to outside school districts, thus causing confusion among other districts. Rather, Springboards repeatedly refers to the confusion of parents, students, and teachers. For instance, Springboards argues that its Campaign and MISD's were "directed to identical groups – students, parents, and educators in the school district[s]." As we explained in a materially identical case rejecting Springboards' claims, the confusion of those persons is "not the appropriate focus of the likelihood-of-confusion analysis" because they are not "purchasers in any ordinary sense." *Ibid.* They merely use a product that the school district buys.[7]

At times, Springboards suggests that third parties in other districts were misled into thinking that MISD's "inferior" program was affiliated with Springboards' Campaign. This is the relevant class of consumers. It is actionable if potential consumers confuse an infringing and inferior product with the authentic mark, as that mistaken association might result in a loss of sales or goodwill. *Id.* at 814. Accordingly, our likelihood of confusion analysis is limited to the question of whether other school districts would likely

---

[7] As in *Houston Independent School District*, Springboards has put forward no evidence that these groups "exercise any influence over [MISD's] purchasing decisions," so there is no potential cause of action for user confusion. *Houston Indep. Sch. Dist.*, 912 F.3d at 813.

confuse MISD's use of "Million Dollar Reader" and similar phrases with Springboards' marks related to its Campaign.[8]

We see no risk of confusion. We follow our two prior cases affirming dismissal of Springboards' infringement claims against other Texas school districts. In *Springboards v. Houston Independent School District*, 912 F.3d 805 (5th Cir. 2019), and *Springboards v. Pharr-San Juan-Alamo Independent School District*, 33 F.4th 747 (5th Cir. 2022), we found no likelihood of confusion when Springboards brought identical Lanham Act claims against school districts for factually indistinguishable monetary-themed reading incentive programs. The more recent of those cases called Springboards' claims "déjà vu all over again" and recognized that the first case was "functionally identical." *Pharr-San Juan-Alamo Ind. Sch. Dist.*, 33 F.4th at 748, 749. The déjà vu continues here. Springboards points to no material distinction between the instant case and our ruling in *Houston Independent School District*. And the district court saw so little difference between MISD and the school district in *Pharr-San Juan-Alamo Independent School District* (also located in Hidalgo County) that it granted both summary judgment at the same time without making any distinction between the two. Nothing material separates this case from its predecessors.

Nevertheless, we briefly recite some of the reasons that Springboards fails to demonstrate any likelihood of confusion. "We need not parse the individual digits [of confusion]" because any possibility of confusion is "exceedingly remote." *Pharr-San Juan-Alamo Ind. Sch. Dist.*, 33 F.4th at 750. To begin with, monetary-themed literacy programs using nearly identical language to Springboards' marks abound and predate Springboards'

---

[8] Because we find there is no likelihood of confusion, we need not decide the open question of whether Springboards must first produce evidence that MISD's program is, in fact, inferior. *See Houston Indep. Sch. Dist.*, 912 F.3d at 814 n.5.

Nos. 21-40333 and 21-40334

Campaign by years. *Houston Indep. Sch. Dist.*, 912 F.3d at 815. Indeed, MISD purchased many of its "Million Dollar Reader" products from a company that began selling similar products in 2010, while Springboards' earliest mark dates only to 2011. Plus, Springboards' sales appear to be overwhelmingly concentrated in one school district, so it is unlikely that other school districts would confuse MISD's program as an inferior knockoff of Springboards'. *Ibid.*

Additionally, there is no evidence that MISD intended to confuse other districts by attempting to "derive benefits from [Springboards'] reputation by using [its] mark." *Viacom Int'l v. IJR Capital Invs., L.L.C.*, 891 F.3d 178, 195 (5th Cir. 2018). Springboards argues that MISD had knowledge of Springboards' Campaign, but "mere awareness . . .does not establish bad intent." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 456 (5th Cir. 2017) (cleaned up). Springboards does not offer any evidence that MISD ever ventured beyond mere awareness. In fact, MISD did not sell or market its program to other school districts at all.

Finally, we note that school districts typically exercise great care as consumers, which makes them unlikely candidates for confusion. "[P]rofessional and institutional" purchasers "are virtually certain to be informed, deliberative buyers." *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986). Public school districts searching for comprehensive literacy programs are a far cry from an individual consumer's grabbing an item off the shelf. They are sophisticated institutions unlikely to be led astray by passing similarities between services. *Houston Indep. Sch. Dist.*, 912 F.3d at 817. In short, there is no risk that other school districts would confuse MISD's program with Springboards' Campaign–related marks.

For substantially the same reasons, Springboards' identical Lanham Act claims against IDEA also fail. While the district court's ruling for IDEA

19

was erroneously predicated on sovereign immunity, we may affirm on other ground "when the record contains an adequate and independent basis for that result." *Lauren C.*, 904 F.3d at 374 (quoting *Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1449 (5th Cir. 1992)).[9] The record shows no risk of confusion.

As noted, Springboards' sales are concentrated in one school district, indicating a relatively weak standing in the market. And school districts commonly use other millionaire-themed reading programs, many of which predate Springboards' marks. *See Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317 (5th Cir. 1981) (widespread third-party use weighs heavily against a likelihood of confusion). Nor is there any evidence that IDEA deliberately used Springboards' marks. While Springboards alleges deliberate misappropriation, its "evidence" is that it and IDEA both use the same balloon vendor for some of their millionaire reader celebrations and that IDEA schools are required to solicit multiple bids for projects rather than engage in "sole source" procurement with a single supplier.

Additionally, IDEA consistently takes steps to signal that its reading program bears no relation to Springboards' Campaign. For instance, IDEA's program refers to "IDEA Millionaire Reader[s]," "IDEA Millionaires," and "IDEA Millionaire Reader's Celebration[s]." Where a user of a mark clearly identifies itself, there is little risk that third parties will be confused about the origin of the mark. *See Oreck*, 803 F.2d at 171 (finding little chance of confusion where a company's advertisements "clearly indicate[d]" that it was "the maker of the product"); *Houston Indep. Sch. Dist.*, 912 F.3d at 816 (concluding a school district's use of its name in connection with the mark "especially mitigates the likelihood of confusion"). Here, since IDEA clearly

---

[9] Both parties fully briefed motions for summary judgment.

Nos. 21-40333 and 21-40334

and consistently connects its reading program to its own name, there is no genuine possibility that other school districts would be confused.

Without a likelihood of confusion, Springboards' Lanham Act claims fail. Judgment is proper for both MISD and IDEA.

## V.

The district court's judgments in favor of MISD and IDEA are AFFIRMED.

Nos. 21-40333 and 21-40334

Andrew S. Oldham, *Circuit Judge*, concurring:

In this case, we were asked to hold that a *private* charter school enjoys state sovereign immunity while a *public* school district does not. The fact that our precedents allow this question to be asked is reason enough to grant en banc rehearing.

The line of cases that make possible such an absurd QP is called the "arm of the State" doctrine. It's cumbersome. It provides nonsensical results. And worst of all, it doesn't even ask the right question. It turns on a multi-part balancing test, comprised of a non-exhaustive list of "*Clark* factors"—none of which is necessary or sufficient to show an entity is an "arm of the State" and thus entitled to state sovereign immunity.[1]

I propose a new single-factor test: Was the entity asserting state sovereign immunity considered "the State" in 1789? If yes, then sovereign immunity. If no, then none.

Part I describes the original public meaning of sovereign immunity in 1789. Part II then discusses what constituted "the State" at the Founding. Part III connects those two concepts and proposes a rule for "arms of the State" to replace our current doctrine. Part IV concludes by applying that rule to this case.

---

[1] Under *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986), the potentially relevant factors—none of which is necessary and none of which is sufficient—include: (1) "whether the state statutes and case law view the entity as an arm of the state"; (2) "the source of the entity's funding"; (3) "the entity's degree of local autonomy"; (4) "whether the entity is concerned primarily with local, as opposed to statewide, problems"; (5) "whether the entity has the authority to sue and be sued in its own name"; and (6) "whether it has the right to hold and use property." *Id.* at 744–45. "Such 'tests' have all the precision of a blunderbuss." *Cutrer v. Tarrant Cnty. Loc. Workforce Dev. Bd.*, 943 F.3d 265, 270 (5th Cir. 2019).

## I.

The doctrine of sovereign immunity was firmly established in the English common law by the thirteenth century. Clyde E. Jacobs, The Eleventh Amendment and Sovereign Immunity 5 (1925) ("At least as early as the thirteenth century . . . it was recognized that the king could not be sued in his own courts . . . ."); Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 2 (1963) ("By the time of Bracton (1268) it was settled doctrine that the King could not be sued *eo nominee* in his own courts."). All sovereign power was "vested by [law] in a single person, the king or queen." 1 William Blackstone, Commentaries *183; *see also Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 446 (1793) (Iredell, J., dissenting) (determining that the Crown alone was "the sovereign of the Kingdom"). This meant that the Crown was "immediately invested [with] all the ensigns, rights, and prerogatives of sovereign power." 1 Blackstone, *supra*, at *183. One such royal prerogative the Crown enjoyed was immunity from suit. *Id.* at *235 ("[N]o suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him."); 3 Blackstone, *supra*, at *255 ("[N]o action will lie against the sovereign, (for who shall command the king?) . . . ."); *see also Chisholm*, 2 U.S. (2 Dall.) at 437 (Iredell, J., dissenting) (compiling sources).

The historical record contains competing justifications for the doctrine of sovereign immunity. Part of the justification was that the Crown was above everyone, so it could be amenable to suit by no one. *See, e.g.*, 1 Blackstone, *supra*, at *242. Part of the justification was that the King was the font of all law, so he could not by definition violate it. *Kawananakoa v. Polyblank*, 205 U.S. 349, 353 (1907) ("A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that

makes the law on which the right depends."). And part of the justification was the courts belonged to the King, so he had the right to refuse consent to suit in his own courts. Interestingly, this last rationale was not limited to the Crown; it extended to feudal lords who also were not amenable to suit in their own courts. 1 F. Pollock & F. Maitland, History of English Law 518 (2d ed. 1899) ("He can not be compelled to answer in his own court, but this is true of every petty lord of every petty manor; that there happens to be in this world no court above his court is, we may say, an accident"); 3 W. Holdsworth, A History of English Law 465 (3d ed. 1927) ("[N]o feudal lord could be sued in his own court").

At the Founding, sovereign immunity became a part of the American common law. *See Chisholm*, 2 U.S. (2 Dall.) at 437 (Iredell, J., dissenting) (concluding that state sovereign immunity comes from "the common law," which "is the ground-work of the laws in every State in the Union," and which is, "where no special act of Legislation controls it, to be in force in each State, as it existed in England, (unaltered by any statute) at the time of the first settlement of the country"); *Alden v. Maine*, 527 U.S. 706, 715–16 (1999); William Baude & Stephen E. Sachs, *The Misunderstood Eleventh Amendment*, 169 U. Pa. L. Rev. 609, 614 (2021). Of course, English conceptions of the doctrine did not map neatly onto the American Republic where sovereignty resides in the People and where we've never had a king or feudal lord.

The most important American innovation to the doctrine was that our Founders left "to the several states, a residuary and inviolable sovereignty." The Federalist No. 39, at 198 (James Madison) (George W. Carey & James McClellan eds., 2001); *see also Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019) (discussing the well-established principle of "dual sovereignty" at the founding (quotation omitted)). As part of their residual sovereignty, all States retained immunity from suits without their consent—in state courts

and in federal ones. *See* THE FEDERALIST NO. 81, at 422 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. . . . [T]he exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the union."); *Alden*, 527 U.S. at 730–754 (holding state sovereign immunity applies in state courts as in federal ones).

For example, the Articles of Confederation provided: "Each State retains its *sovereignty*, freedom, and independence, and every Power, Jurisdiction, and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." ARTICLES OF CONFEDERATION art. II (U.S. 1781) (emphasis added). Likewise, courts commonly held that States were immune from suit. For example, in *Nathan v. Virginia*, 1 U.S. (1 Dall.) 77 (C.C.P. Phila., Phila. Cnty., 1981), the court agreed with the attorney general that each State "was a sovereign" so that "every kind of process" issued against a State was "null and void." *Ibid.*; *see also* Nelson, *supra*, at 1579. Likewise, in *Moitez v. The South Carolina*, 17 F. Cas. 574 (No. 9697) (1781), a Pennsylvania Admiralty Court dismissed a suit against a South Carolina warship on the grounds that it was owned by a "sovereign independent state." *Ibid.* Other pre-constitutional sources confirmed. *See, e.g.*, THE FEDERALIST NO. 81, at 422 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) (claiming that sovereign immunity "is *now* enjoyed" by each State, referring to a time before ratification (emphasis added)); THE FEDERALIST NO. 39, at 198 (James Madison) (George W. Carey & James McClellan eds., 2001) (discussing the "inviolable sovereignty" of States); *McIlvaine v. Coxe's Lessee*, 8 U.S. (4 Cranch) 209, 212 (1808) ("This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this union . . . became entitled, from the time when they declared

themselves independent, to all the rights and powers of sovereign states
. . . .”); *see also Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1493–94
(2019); *Alden*, 527 U.S. at 726–27; *Gamble*, 139 S. Ct. at 1968 (“When the
original States declared their independence, they claimed the powers
inherent in sovereignty. The Constitution limited but did not abolish the
sovereign powers of the States . . . .” (quotation omitted)).

As many have argued, the Constitution didn’t override common-law
sovereign immunity. *See, e.g.*, *Gamble*, 139 S. Ct. at 1968; *Franchise Tax Bd.
of Cal.*, 139 S. Ct. at 1495–96; William Baude, *Sovereign Immunity and the
Constitutional Text*, 103 Va. L. Rev. 1, 8–9 (2017); Caleb Nelson, *Sovereign
Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559,
1580–1601 (2002); Stephen E. Sachs, *Constitutional Backdrops*, 80 Geo.
Wash. L. Rev. 1813, 1816–18, 1828–34 (2012); Bradford R. Clark, *The
Eleventh Amendment and the Nature of the Union*, 123 Harv. L. Rev. 1817,
1862–75 (2010); Kurt T. Lash, *Leaving the Chisholm Trail: The Eleventh
Amendment and the Background Principle of Strict Construction*, 50 Wm. &
Mary L. Rev. 1577, 1599–1603, 1618–27, 1649–50, 1653–76 (2009); Steven
Menashi, *Article III as a Constitutional Compromise: Modern Textualism and
State Sovereign Immunity*, 84 Notre Dame L. Rev. 1135, 1155–75 (2009).
The ratification debates, negative public reactions to *Chisholm v. Georgia*
(holding that there was no common-law sovereign immunity for States from
out-of-state citizen suits under the Constitution), and Congress’s swift
passage of the Eleventh Amendment in response to *Chisholm* all indicate as
much.

Common-law sovereign immunity is different from Eleventh
Amendment sovereign immunity. The latter only prohibits suits brought by
out-of-state plaintiffs in federal court: “The Judicial power of the United
States shall not be construed to extend to any suit in law or
equity, commenced or prosecuted against one of the United States by

Nos. 21-40333 and 21-40334

Citizens of *another* State, or by Citizens of any Foreign State." U.S. Const. amend. XI (emphasis added). The former is broader in a sense[2] because it applies even a citizen sues his home State. *Coolbaugh v. Commonwealth*, 4 Yeates 493 (Pa. 1808) (finding it "a settled principle, that no sovereign power [is] amenable to suits either in its own courts, or those of a foreign country, unless by its own consent"); *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529 (1857) (applying the "established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission" in a suit against a State in its own court); *The Siren*, 74 U.S. (7 Wall.) 152, 153–54 (1868) ("It is a familiar doctrine of the common law, that the sovereign cannot be sued in his own courts without his consent."); *Cunningham v. Macon & B.R. Co.*, 109 U.S. 446, 451 (1883) ("It may be accepted as a point of departure unquestioned, that neither a state nor the United States can be sued as defendant in any court in this country without their consent . . . ."). This practice culminated most famously in *Hans v. Louisiana*, 134 U.S. 1 (1890), which held that a State cannot be sued by its own citizen. *See id.* at 14–15. And the Court continues to "uph[o]ld States' assertions of sovereign immunity in various contexts outside the literal text of the Eleventh Amendment" today. *Alden*, 527 U.S. at 727; *see also PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2264 (2021) (Gorsuch, J., dissenting); Baude & Sachs, *supra*, at 612–14.

This case implicates common-law sovereign immunity, not the Eleventh Amendment. Plaintiff Springboards to Education, Inc. is a citizen

---

[2] In another sense common-law sovereign immunity is narrower than the immunity recognized by the Eleventh Amendment: Common-law sovereign immunity can be waived by the sovereign, whereas the Eleventh Amendment (at least by its plain text) speaks in subject-matter-jurisdiction terms that presumably cannot be waived. Baude & Sachs, *supra*, at 623–24.

of Texas, and defendants McAllen Independent School District and IDEA Public Schools both claim to be the State of Texas. So we're necessarily discussing the common law of sovereign immunity that predated the Eleventh Amendment and survived its ratification.

## II.

The next question is what (or who) qualified as the "State" under the common law of sovereign immunity in 1789? As with so many historical inquiries, this one has points of clarity and points of ambiguity. I (A) begin with what we know for sure: Corporations were *not* considered the State under the common law. They had no sovereign immunity. Then I (B) cautiously wade into territory with limited historical evidence: whether unincorporated state agencies, boards, and departments were considered the State. It appears that the immunity of these entities in federal court was left in the hands of the States.

## A.

First, corporations. It's evident that at common law, both in England and the early American Republic, incorporated entities were not entitled to sovereign immunity. This rule applied regardless of whether the corporations were private or public and regardless of whether they exercised governmental functions.

As Chief Justice Marshall said, "[a]s our ideas of a corporation, its privileges and its disabilities, are derived entirely from the English books, we resort to them for aid, in ascertaining its character." *Bank of U.S. v. Deveaux*, 9 U.S. (5 Cranch) 61, 88 (1809). In his *Commentaries on the Laws of England*, Blackstone identified many types of corporations at common law, including civil corporations, churches, colleges and universities, hospitals, manufacturing or commercial organizations, the royal society, and notably, corporations "erected for the good government of a town or particular

district." 1 BLACKSTONE, *supra*, at *458–59. These corporations could only be created with the consent of the sovereign. *Id*. at *460. Once they were created, they could "sue or be sued, implead or be impleaded, grant or receive, . . . and do all other acts as natural persons may." *Id*. at *463. And for that reason, a corporation could not assert the sovereign's immunity from suit. *See, e.g.*, *Moodalay v. Morton*, (1785) 28 Eng. Rep. 1245 (Ch.).

At the Founding, America embraced the English conception of corporations. This theme was pervasive throughout the constitutional debates and early American court cases. *See* Lash, *supra*, at 1657.

First, the constitutional debates. For all that the Federalists and Anti-Federalists disagreed about, they agreed that corporations were not sovereigns. Both drew sharp distinctions between corporations, which weren't immune from suits, and sovereigns, which were, to advance their arguments.

The Federalists began this debate by contending that States were akin to corporations. *See* 1 M. FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, at 323, 328 (1907) (Alexander Hamilton: discussing how the States were "Corporations" with mere "corporate rights"); *id*. at 357–58 (James Madison); *id*. at 471 (James Madison: "There is a gradation of power in all societies, from the lowest corporation to the highest sovereign. The states never possessed the essential rights of sovereignty . . . . The states, at present, are only great corporations . . . ."); *id*. at 552 (Gouverneur Morris: "[The States] were originally nothing more than colonial corporations.").

The Anti-Federalists responded strongly and persuasively. They argued that the Federalists sought to reduce sovereign States to "mere corporation[s]." *The Address of the Seceding Assemblymen* (Oct. 2, 1787), *reprinted in* 13 THE DOCUMENTARY HISTORY OF THE RATIFICATION

of the Constitution 295, 296 (John P. Kaminski & Gaspare J. Saladino eds., 1981); *see also* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 403 (Jonathan Elliot ed., 1836) [hereinafter Elliot's Debates] (Thomas Tredwell in the New York convention: "The sole difference between a state government under this Constitution, and a corporation under a state government, is, that a state being more extensive than a town, its powers are likewise proportionally extended, but neither of them enjoys the least share of sovereignty . . . ."); *Democrat*, Mass. Mercury (Bos.), July 23, 1793, *reprinted in* 5 The Documentary History of the Supreme Court, 1789–1800, at 393, 393 (Maeva Marcus ed., 1994) [hereinafter DHSC] (noting that some feared the Constitution as written "destroy[ed] the SOVEREIGNTY of the states, and render[ed] them no more than corporate towns"); *Cato II* (Oct. 11, 1787), *reprinted in* 13 The Documentary History of the Ratification of the Constitution, *supra*, at 369, 371 (arguing that "the different states do not retain separately their sovereignty and independency" under the Constitution); 3 Elliot's Debates, *supra*, at 527 (George Mason: "Is this state to be brought to the bar of justice like a delinquent individual? Is the sovereignty of the state to be arraigned like a culprit, or private offender?").

And the Anti-Federalists proved triumphant. The Federalists eventually conceded that States were not corporations and hence would retain sovereign immunity. *See* 3 Elliot's Debates, *supra*, at 533 (James Madison); The Federalist No. 81 (Alexander Hamilton); 3 Elliot's Debates, *supra*, at 555 (John Marshall); *Brutus*, Indep. Chron. (Bos.), July 18, 1793, *reprinted in* 5 DHSC, *supra*, at 392, 392 (Rufus King); *Democrat*, *supra*, at 393–94, 394 nn.3–4 (Rufus King). The Federalists insisted, however, that no one would be so silly as to sue a sovereign State in federal court. *See* The Federalist No. 81, at 422 (Alexander Hamilton)

(George W. Carey & James McClellan eds., 2001) (stressing that "the danger intimated must be merely ideal").

Second, this sharp line between corporations and sovereigns is also clear in early American court cases. The very first case entered on the Supreme Court docket, *Van Staphorst v. Maryland*, 2 U.S. (2 Dall.) 401 (1791), involved a suit against a State. *See* 5 DHSC, *supra*, at 7, 16. While the Court didn't reach the question of immunity, many members of the public raised red flags, and the sovereign/corporation distinction animated their objections. For example, one anonymously published letter heralded the danger that "[s]hould this action be maintained," it would mean "the several States, have relinquished all their SOVEREIGNTIES, and have become mere *corporations*." *Letter from an Anonymous Correspondent*, Indep. Chron. (Phila.), Feb. 13 & 19, 1791, *reprinted in* 5 DHSC, *supra*, at 20, 21. The letter went on: "For a Sovereign State, can never be sued, or coerced, by the authority of another government." *Ibid*. To be sued, States would have to become "*mere corporations*." *Ibid*. Massachusetts Attorney General James Sullivan also published his concern that this suit reduced the States from "an assemblage of republics" under the federal government to "divers corporations." James Sullivan, *Observations upon the Government of the United States of America* (Bos.), July 7, 1791, *reprinted in* 5 DHSC, *supra*, at 21, 21. He concluded that without immunity, States were "mere corporation[s]" devoid of sovereignty. *Id*. at 29.

The Court confronted this problem again in *Oswald v. New York*, 2 U.S. (2 Dall.) 401 (1792). And again, the Court didn't have a chance to decide the issue. *Ibid*. But Justice Iredell, who would pen the lone dissent in *Chisholm v. Georgia* one year later, began to explore the differences between a State and a "mere Corporation" in a draft opinion. *See James Iredell's Observations on State Suability* (Phila.), Feb. 11–14, 1792, *reprinted in* 5 DHSC, *supra*, at 76, 87–88.

By the time the Court heard *Chisholm v. Georgia*, it knew the question of State suability boiled down to whether States were more akin to sovereigns or corporations. The majority and dissent *agreed* that sovereigns were entitled to immunity while corporations were not. They merely disagreed on whether States were sovereigns or corporations. *Compare Chisholm*, 2 U.S. (2 Dall.) at 468 (Cushing, J.) ("As to corporations, all States whatever are corporations or bodies politic."), *and id.* at 472 (Jay, C.J.) (arguing there's no difference between suing a municipal corporation and suing a State), *with id.* at 448 (Iredell, J., dissenting) (discussing the "differences between such corporations, and the several States in the Union").

Justice Iredell's lone *Chisholm* dissent is particularly instructive. That's in part because his interpretation ultimately won the day—both in the short-term with the passage of the Eleventh Amendment, and in the long-term with the Court's endorsement of his view of common-law sovereign immunity. *See Hans*, 134 U.S. at 16. But of greater relevance for present purposes, Justice Iredell discussed at length the "common law" of corporations and sovereigns. *Chisholm*, 2 U.S. (2 Dall.) at 447 (Iredell, J., dissenting). He first argued that under the common law, a "corporation is a mere creature" of the sovereign and "owes its existence . . . to the authority which create[d] it." *Id*. at 448. Conversely, a "State does not owe its origin to the Government of the United States" but rather "derives its authority from the same pure and sacred source as itself: The voluntary and deliberate choice of the people." *Ibid*. Similarly, a corporation "is altogether depend[e]nt on that Government to which it owes its existence." *Ibid*. Its "charter may be forfeited," and its "authority may be annihilated." *Ibid*. But a State is "totally independent" of the federal government. *Ibid*. Because of these differences, Justice Iredell concluded that while corporations are not immune from suits, States are "altogether exempt from the jurisdiction of

the Courts of the United States" except for "the special instances where the general Government has power derived from the Constitution itself." *Ibid*.

The public response to *Chisholm* echoed this categorization. For example, one newspaper said that while the Constitution provided that "Congress should guarantee to every State in the Union a Republican form of government[,] '[*a*] *form of government*' was never a mode of expression applied to the police of a town, parish, city or other corporation." *"The True Federalist" to Edmund Randolph, Number II*, Indep. Chron. (Bos.), Jan. 23 & 27, 1794, *reprinted in* 5 DHSC, *supra*, at 243, 245 [hereinafter *The True Federalist*].

A few months later, Justice Iredell's outcry reverberated through the halls of the Massachusetts General Assembly. In opposition to a suit against the Commonwealth, *Vassall v. Massachusetts*, Massachusetts Governor Hancock delivered a rousing speech. *See John Hancock's Address to the Massachusetts General Court*, Indep. Chron. (Bos.), Sept. 18, 1793, *reprinted in* 5 DHSC, *supra*, at 416, 416. He argued that the rights of State as sovereigns could not be reduced to those of "mere Corporations." *Id*. at 418. Others echoed his sentiments. *See, e.g.*, *William Widgery's Speech in the Massachusetts House of Representatives*, Indep. Chron. (Bos.), Sept. 23, 1793, *reprinted in* 5 DHSC, *supra*, at 427, 428 (distinguishing between the State and "mere dependent corporations"); *Brutus*, *supra*, at 392 (urging the Massachusetts General Assembly to respond or risk becoming "an unimportant subordinate corporation"). The General Assembly rallied to its Governor's side. It refused to answer Vassall's suit, and the Court eventually dismissed it. *See Reply of the Massachusetts General Court to John Hancock*, Indep. Chron. (Bos.), Sept. 27, 1793, *reprinted in* 5 DHSC, *supra*, at 441, 441.

In the early nineteenth century, the Court relied even more on this formal division between corporations and sovereigns. In *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819), the Court examined the nature of the Dartmouth College corporate charter with New Hampshire. *Id*. at 626–27. In doing so, the Court again considered the common law of corporations. It determined that a corporation was "a collection of individuals, united into one collective body, under a special name, and possessing certain immunities, privileges and capacities, in its collective character." *Id*. at 667. Notably, as "artificial person[s]," corporations were not immune from lawsuits; they could "sue and be sued." *Ibid*.

This sovereign-corporate distinction is best illustrated by a series of suits against State-created banks. In those cases, the Court repeatedly held that even "a bank created by the government for its own uses, whose stock [was] *exclusively owned* by the government, [was a] public corporation," and thereby unprotected by sovereign immunity. *Id*. at 669 (emphasis added); *see also Bank of Commonwealth of Ky. v. Wister*, 27 U.S. (2 Pet.) 318, 319 (1829) (holding that even though Kentucky "was the sole proprietor of the stock of the bank," the bank was not the Commonwealth and therefore was not entitled to sovereign immunity); *Bank of U.S. v. Planters' Bank of Ga.*, 22 U.S. (9 Wheat.) 904, 908 (1824) (holding that even where Georgia was a proprietor and corporator of the Bank, the "Planters' Bank of Georgia [was] not exempted from being sued in the federal courts"); *Briscoe v. Bank of Commonwealth of Ky.*, 36 U.S. (11 Pet.) 257, 327 (1837) (holding that even though Kentucky was the sole stockholder of the bank, the bank was not entitled to sovereign immunity); *Darrington v. Bank of Ala.*, 54 U.S. (13 How.) 12, 16–17 (1851) (same); *Curran v. Arkansas*, 56 U.S. (15 How.) 304, 309 (1853) ("[A] State . . . by owning all the capital stock [in a bank], does not impart to that corporation any of its privileges or prerogatives . . . ."). The

mere fact that the State held all the financial interest in a bank did not make the bank an arm of the State.[3] Rather, the State's incorporation of the bank severed any connection between the State and the bank for purposes of sovereign immunity. *See Planters' Bank of Ga.*, 22 U.S. (9 Wheat.) at 907 ("The suit is against a corporation, and the judgment is to be satisfied by the property of the corporation, not by that of the individual corporators. The State does not, by becoming a corporator, identify itself with the corporation. The Planters' Bank of Georgia is not the State of Georgia, although the State holds an interest in it.").

And while the Court highlighted the differences between corporations and the States, it minimized any differences between types of corporations. For example, the Court held that there was no distinction between public and private corporations—neither was entitled to sovereign immunity. *See, e.g.*, *Trustees of Dartmouth College*, 17 U.S. (4 Wheat.) at 668. The Court allowed suits to proceed against corporations with "public political purposes only, such as towns, cities, parishes and counties." *Ibid*. The Court concluded that even corporations "founded by the government, for public purposes, where the whole interests belong also to the government," were not "the State" for purposes of sovereign immunity. *Id*. at 669; *see also Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 772 (1824) (The State's "mere creation of a corporation, does not confer political power or political character" even where the corporation is given "public employments" normally reserved to the State.); *cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 442 (1821) (discussing how Congress's incorporation of the City of Washington created

---

[3] This fact alone suggests the *Clark* factors must be overturned. *Clark*'s emphasis on the financial ties between an entity and the State to determine if the entity is an arm of the State has no foundation in our legal history and tradition.

a "*separate* body for the management of the internal affairs of the City, for its internal government, for its police" (emphasis added)).

Other examples of corporations included "hospital[s] created and endowed by the government for general charity," "insurance, canal, bridge, and turnpike companies," "college[s]," and other "eleemosynary corporations." *Trustees of Dartmouth College*, 17 U.S. (4 Wheat.) at 668. Even when a college "acquire[d] the character of a public institution," it retained its corporate status. *Id.* at 669. It didn't miraculously become the State. Regardless of the types of corporations or the State's involvement in them, the Court consistently found corporations weren't entitled to sovereign immunity.

The Court continued to abide by this formalistic rule throughout the nineteenth century—even as corporations grew in number and took on more public functions. For example, when confronted with a suit against a school board, the Court looked exclusively to the text of the State's statute and concluded that "the language of the Nebraska statute makes school districts corporations in the fullest sense of the word." *School Dist. No. 56 v. St. Joseph Fire & Marine Ins. Co.*, 103 U.S. (13 Otto) 707, 708 (1880). The Court concluded its inquiry with the text, finding "no warrant for [a] distinction" between private and public corporations and concluding that both could be sued. *Id.* at 709. This principle was so well-established by the time the Court decided *Lincoln County v. Luning*, 133 U.S. 529 (1890), that the Court held it was "beyond question" that the county could be sued. *Id.* at 530; *see also P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 881–82 (D.C. Cir. 2008) (Williams, J., concurring). On the same day that the Court decided *Hans v. Louisiana*, it held in *Lincoln County* that an incorporated county was not the State for purposes of sovereign immunity. *Lincoln County*, 133 U.S. at 530 ("[W]hile the county is territorially a part of the state, yet politically it is also a corporation created by, and with such powers as are given to it by, the state.

In this respect, it is a part of the state only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the state.").

In sum, it's clear that incorporated entities or entities with sue-and-be-sued clauses did not qualify as "the State" for purposes of sovereign immunity at the Founding. Any "arm of the State" rule must account for this history to properly reflect the common-law immunity that predated and survived the Constitution.

## B.

It's less clear whether unincorporated, State-created entities were entitled to sovereign immunity. The English common law isn't helpful since the American notion of "dual sovereignty" had no counterpart across the Atlantic. The constitutional ratification debates don't have much to contribute because the Federalists and Anti-Federalists primarily debated whether the States would have immunity *at all*. *See supra* at 8–9. But as far as I can tell, neither side devoted much time to discussing *which* state entities might be immune from suit. And the law reports don't provide much help either. While some state constitutions created agencies, boards, or departments in the late eighteenth or early nineteenth centuries, these entities were not nearly as powerful or as numerous as they are today. And when plaintiffs sought damages or injunctive relief against the State in federal court, they sued "the State" or a State officer by name.[4] It isn't clear how

---

[4] The early Supreme Court's record on officer suits also isn't especially enlightening. That's because most of these cases post-dated *Chisholm* and were decided under the rubric of the Eleventh Amendment. *See, e.g.*, *Osborn*, 22 U.S. at 857. And it's also because Marshall's Court wasn't consistent. In one breath it said sovereign immunity only barred suits naming "the State" as the defendant. *See ibid.* ("[T]he jurisdiction of the Court depends . . . upon the actual party on the record. . . . [T]he 11th amendment, which restrains the jurisdiction granted by the constitution over suits against States, is, of

federal courts would've treated a defendant such as the Texas Department of Public Safety if it existed at the time.

But we have some data points. We know that the Constitution explicitly provided that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Under this division of power, federal "jurisdiction extend[ed] to certain enumerated objects only," leaving "to the several states, a residuary and inviolable sovereignty over all other objects." The Federalist No. 39, at 198 (James Madison) (George W. Carey & James McClellan eds., 2001). Among the well-established powers reserved to the States was the power to structure their governments as they saw fit. *See, e.g.*, Roger Sherman, *A Citizen of New Haven, II*, New Haven Gazette (Dec. 25, 1788), *reprinted in* Essays on the Constitution of the United States: Published During its Discussion by the People 1787–1788, at 237, 238 (Paul Leceister Ford ed., 1892) ("The powers vested in the federal government are clearly defined, so that each state still retain its sovereignty in what concerns its own internal government, and a right to exercise every power of a

---

necessity, limited to those suits in which a State is a party on the record."); *see also Davis v. Gray*, 83 U.S. (16 Wall.) 203, 220 (1872) (reading *Osborn* to hold that "[m]aking a State officer a party does not make the State a party, although her law may have prompted his action, and the State may stand behind him as the real party in interest" and a "State can be made a party only by shaping the bill expressly with that view"). And in the next breath it said that officers may be "the State" for purposes of sovereign immunity, especially where the suit sought to recover the State's property. *See Governor of Ga. v. Madrazo*, 26 U.S. (1 Pet.) 110, 123–24 (1828) ("[W]here the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think the state itself may be considered as a party on the record."); *United States v. Peters*, 9 U.S. (5 Cranch) 115, 139 (1809) (allowing a suit against the Pennsylvania treasurer in his personal capacity but stipulating that "[i]f these proceeds had been the actual property of Pennsylvania" it "would have presented a case on which it was unnecessary to give an opinion").

sovereign state not particularly delegated to the government of the United States."). That's why, for example, Texas can have a bicameral legislature and Nebraska can have a unicameral one. There's no mandated, one-size-fits-all structure for "the State."

We also know from various discussions of sovereign immunity at the Founding that it didn't just rest with abstract "States." It belonged to "state governments." *See, e.g.*, The Federalist No. 81, at 422 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) (Sovereignty belongs to the "*government* of every State in the Union." (emphasis added)); The Federalist No. 32, at 155 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) ("[*S*]*tate governments* would clearly retain all the rights of sovereignty . . . ." (emphasis added)); *Brutus XIII* (Feb. 21, 1788), *reprinted in* 2 The Complete Anti-Federalist 428, 429 (Herbert Storing ed., 1981) (subjecting a State to suit "is humiliating and degrading to a [state] *government*" (emphasis added)); *Federal Farmer III* (Oct. 10, 1787), *reprinted in* 2 The Complete Anti-Federalist, *supra*, at 234, 245 ("How far it may be proper to admit a foreigner or the citizen of another state to bring actions against *state governments* . . . is doubtful . . . ." (emphasis added)); *Martin v. Hunter's Lessee*, 14 U.S. 304, 325 (1816) ("[S]overeign powers vested in the state *governments*, by their respective constitutions, remained unaltered and unimpaired, except so far as they were granted to the government of the United States." (emphasis added)); 2 Elliot's Debates, *supra*, at 403 (Thomas Tredwell's remarks in New York Ratifying Convention: referencing the sovereign power as belonging to "state *governments*" (emphasis added)); *The True Federalist*, *supra*, at 245 ("The word State in itself, signifies a sovereign *government*." (emphasis added)); Sullivan, *supra*, at 29 ("sovereignty of the [state] *governments*" (emphasis added)); 1 Elliot's Debates, *supra*, at 327 (New York Ratification Statement: "every power, jurisdiction, and right"

not delegated to Congress "remains to the people of the several states, or to their respective *state governments*" (emphasis added)); 1 Elliot's Debates, *supra*, at 334 (Rhode Island Ratification Statement: same); *Report of a Joint Committee of the Massachusetts General Court*, Indep. Chron. (Bos.), June 20, 1793, *reprinted in* 5 DHSC, *supra*, at 230, 230 (arguing that subjecting States to suits is "in its principle subversive of the *State Governments*" (emphasis added)); 4 Elliot's Debates, *supra*, at 259–60 (Charles Pinckney speech before South Carolina House of Representatives: "The distinction which has been taken between the nature of a federal and *state government* appeared to be conclusive—that in the former, no powers could be executed, or assumed, but such as were expressly delegated; that in the latter, the indefinite power was given to the *government*, except on points that were by express compact reserved to the people." (emphases added)).

Thus, while the historical evidence doesn't provide a clear answer to whether an unincorporated entity created by the State—like a state agency—enjoyed sovereign immunity at the Founding, any theory must account for these well-established principles: (1) sovereign immunity belonged to state governments, and (2) States retained the power to structure their governments as they saw fit after the Constitution. These two principles suggest that the State can imbue its constituent parts with sovereign immunity when creating them as unincorporated arms of the State. For example, Texas could choose not to have a Health and Human Services Commission or a Department of Public Safety or a Commission on Environmental Quality, and it could choose instead to perform its health, safety, and environmental functions under one undifferentiated state government that (obviously) enjoys common-law sovereign immunity. The fact that the State chose, in its sovereign prerogative, to create those unincorporated agencies of state government does not appear to change the

conclusion that these agencies still constitute "the State" and enjoy the same sovereign immunity.

## III.

From this historical evidence about incorporated and unincorporated state government entities we can distill a rule to determine whether an entity is an immune "arm of the State."

If an entity has a separate legal status from the State (*e.g.*, as a corporation, LLC, or § 501(c)(3) nonprofit organization) or the state statute designating the entity includes a "sue-and-be-sued" clause, the entity is not "the State" and hence is not entitled to sovereign immunity. That's because the State has classified these entities as distinct legal persons, and a federal court cannot second-guess the State's decision.[5] All other State-created entities are presumably arms of the State and entitled to sovereign immunity.

This rule has several advantages over the *Clark* factors.

First, it aligns with the Supreme Court's guidance. In *Regents of the University of California v. Doe*, 519 U.S. 425 (1997), the Court stressed that any arm-of-the-State inquiry hinges on state law:

> Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore "one of the United States" within the meaning of the Eleventh Amendment, is a question of federal law. But that federal question can be

---

[5] In *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999), the Court accepted the district court's determination that an incorporated entity with such a sue-and-be-sued clause was an arm of the State. *Id.* at 633 n.3 (1999). But the Court stipulated that this was "a conclusion the parties did not dispute before either the Federal Circuit or this Court." *Ibid.*

Nos. 21-40333 and 21-40334

answered *only after* considering the provisions of state law that
define the agency's character.

*Id.* at 429 n.5 (emphasis added). *Clark* by contrast is a pre-*Regents* relic. And
it minimizes the importance of state law as only one of many factors and less
important than others. *See Clark*, 798 F.2d at 736, 744; *Hudson v. City of New
Orleans*, 174 F.3d 677, 682 (5th Cir. 1999). All else being equal, if state law
says the unincorporated entity is not the State, but the entity is funded by the
state treasury, a court will conclude it's "the State." *See Hudson*, 174 F.3d at
682 (finding that the source of funding is the most important *Clark* factor).
This result departs from *Regents* and accordingly must be overruled.

Second, the proposed bright-line rule is grounded in what sovereign
immunity meant at the Founding. As previously discussed, early American
courts expressly disavowed any connection between an entity's entitlement
to sovereign immunity and its connection to the state treasury. *See supra* at
13–14 & n.2. *Clark*, by contrast, pivots on the funding factor. *Ibid*. Thus, it
abandons any tether to the common law (or the Eleventh Amendment for
that matter).

Third, the proposed rule is workable. As the majority rightly notes,
the *Clark* factors are cumbersome and at times irreconcilable with one
another. They don't provide clear answers and lead to nonsensical results.

Finally, the proposed rule respects the States' powers under the
Tenth Amendment to structure their governments however they see fit. The
*Clark* factors, by contrast, give federal judges the power to decide what
qualifies as "the State." The result is a pandora's box—there's no telling
what will come out. States have no notice, and they cannot structure their
governments in predictable ways and in accordance with their sovereign
prerogatives. The proposed test enables state governments to order their
affairs so they can foreseeably raise sovereign immunity.

Nos. 21-40333 and 21-40334

IV.

Finally, it's time to apply this arm-of-the-State rule to the facts at hand.

The McAllen Independent School District concedes that the Texas Education Code gives it the power to "sue and be sued." The Code says: "The trustees of an independent school district constitute a body corporate and in the name of the district may . . . sue and be sued . . . ." Tex. Educ. Code § 11.151(a). The district is a corporation that can be sued by name, so it's not entitled to sovereign immunity.

IDEA Public Schools is a § 501(c)(3) nonprofit organization. ROA.21-40334.169, 2241. Thus, it's not entitled to sovereign immunity.

\*      \*      \*

The *Clark* factors do not reflect the common law of sovereign immunity. They are cumbersome and indeterminate. And they prompt needless litigation, as this case illustrates. Our en banc court should revisit them.[6]

---

[6] Lest there be any confusion, the question addressed in this opinion is what constitutes "the State"—and hence what enjoys the State's sovereign immunity in *federal* court. The States are obviously free to cloak non-State entities with all manner of governmental immunities in *state* court, and as with almost everything in our federal system, the State need not follow federal standards in doing so. *See, e.g.*, Tex. Educ. Code 12.1056(a).